IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Edward W. Nottingham**

Civil Action No. 05–cv–01913–EWN–MEH


DELFINO ORTEGA,

    Applicant,

v.

RON LEIBA, WARDEN, A.V.C.F., and
THE ATTORNEY GENERAL OF THE
STATE OF COLORADO,

    Respondents.

---

## ORDER AND MEMORANDUM OF DECISION

---

Petitioner Delfino Ortega seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254

(2006).  Petitioner, a state prisoner currently facing a life sentence, was convicted in state court of

two counts of first degree murder, one of which was reversed on appeal.  He now challenges the

constitutionality of the trial court's: (1) admission of polygraph evidence; (2) determination that

the improper admission of hearsay testimony was harmless with regard to one of his convictions;

(3) denial of his motion to sever; and (4) jury instruction concerning the prosecution's burden of

proof.  This matter is before the court on Petitioner's "Application for a Writ of Habeas Corpus

Pursuant to 28 U.S.C. § 2254," filed October 3, 2005.  Jurisdiction is premised upon 28 U.S.C. §

2254 (2006).

**FACTS**

*1.       Factual Background*

*a.       Overview*

Under 28 U.S.C. § 2554(e), when a federal district court addresses "an application for a

writ of habeas corpus by a person in custody pursuant to a judgment of a State court, a

determination of a factual issue made by a State court shall be presumed to be correct."  28

U.S.C. § 2254(e)(1) (2006).  The following synopsis is taken from the Colorado Court of

Appeal's ("CCOA") opinion summarizing the prosecution's evidence.  (Application for Writ of

Habeas Corpus Pursuant to 28 U.S.C. § 2254, Ex. 1, Part 1 at 62 [*People v. Ortega*, 01CA1925

(Colo. Ct. App. May 29, 2003) (unpublished) (hereinafter "CCOA Decision")] [filed Oct. 3,

2005] [hereinafter "Pet'r's App."].)  Petitioner, a barber, was approached by his customer, Tom

Phillips ("Phillips"), about whether Petitioner knew anyone who could set up a robbery and kill

Phillips' wife, Ann Phillips.  (*Id.*)  Petitioner agreed to do the job for $10,000.  (*Id.*)  After having

several conversations with Phillips, Plaintiff carried out the killing and the staged robbery.  (*Id.*)

More than a year later, Phillips was asked several times by his friend, Joe Bonicelli ("Bonicelli"),

whether he knew anyone who could get rid of *his* wife, Eloise Bonicelli.  (*Id.*)  After speaking

with Petitioner, Phillips told Bonicelli that Petitioner would "take care of the situation for

$10,000."  (*Id.*)  Phillips then put Bonicelli and Petitioner in contact with each other.  (*Id.*)  A few

months later, Wilfred Marquez, whom Petitioner engaged through one of his coworkers at the

barbershop, entered the Bonicelli home, fatally shot Eloise Bonicelli, and wounded her nephew,

John Gambrell.  (*Id.*)

-2-

### b.    Evidence

Plaintiff was tried and convicted for both murders.  This court's independent review of the trial record shows the evidence directly supporting Plaintiff's conviction for the Phillips murder was centered upon the testimony of Phillips, who accepted an offer of immunity conditioned upon him telling the truth.  (State Record of *People v. Ortega*, 00CR3433 [Colo. Dist. Ct. 2001] at v. 12, pp. 1472–43, 1517–18 [hereinafter "State R."].)  Phillips testified that he had entered into an agreement to pay Petitioner $10,000 to murder Ann Phillips on the night of March 25, 1974. (*Id.*)  The plan, according to Phillips, was that a car would follow him as he drove home with his wife from their jointly owned bar; the car would then signal Phillips to pull over by means of a blinking red light, and, in the course of a robbery, Ann Phillips would be shot fatally and Phillips would be shot non-fatally.  (*Id.* at v. 12, pp. 1472–76.)  On March 25, 1974, after leaving their bar, Ann Phillips was in fact fatally shot after she and her husband were pulled over by a car with a red flashing light; Phillips was knocked unconscious by a blow to the head.  (*Id.* at v. 11, pp. 1187, 1303; v. 12, pp. 1485, 1492–93, 1557.)  Phillips testified that after he received insurance money for his wife's death, he paid Petitioner $10,000 in cash for the murder.  (*Id.* at v. 12, pp. 1496–97, 1542.)  Petitioner's fingerprints were found on the passenger's side door of the Phillips' vehicle.  (*Id.* at v. 12, pp. 1617–18, 1635, 1644.)

The following evidence directly supported Petitioner's conviction for the Bonicelli murder. Phillips testified that in the early 1970's, his friend, Bonicelli, asked if Phillips knew anyone who would kill his wife for him. (*Id.* at v. 12, pp. 1502–03.)  Phillips, in turn, asked Petitioner if he knew someone who would commit the murder.  (*Id.*)  According to Phillips, Petitioner eventually

said that he would take care of the situation for around $10,000, at which point Phillips put

Petitioner and Bonicelli in contact.  (*Id.* at v. 12, pp. 1506–08.)  On November 23, 1975, a man

came to the door of the Bonicelli home and said that he wanted to rent an apartment.  (*Id.* at v.

13, pp.1745–46.)  The man shot Gambrell, Eloise Bonicelli's nephew, in the chest; Gambrell was

able to run to the basement and call the police.  (*Id.* at v. 13, pp. 1175–76, 1896.)  Eloise

Bonicelli was shot in the chest and died.  (*Id.* at v. 11, p. 1202.)  Mr. Gambrell later identified the

shooter as looking like Freddie Fender, a country western singer.  (*Id.* at v. 13, p 1756.)  Initially,

he chose Petitioner's photo as "a good look-alike," but later identified Marquez as the shooter.

(*Id.* at v. 13, pp. 1756–60.)

According to the testimony of Richard Butierres, Bennie Valdez's step-son, Valdez

worked at Petitioner's barber shop in the 1970's, and Marquez was a friend of Valdez.  (*Id.* at v.

15, pp. 2259, 2261, 2379–80.)  Further, while in prison, Butierres learned from Marquez that he

and Valdez took the contract for the Bonicelli murder from Petitioner, and that Petitioner never

paid Marquez for the hit.  (*Id.* at v. 15, pp. 2261–64.)  At Petitioner's trial, Marquez's ex-

girlfriend testified that soon after the Bonicelli murder, Marquez called her and told her he had

just finished doing a job for $10,000 and, before leaving town, wanted to stop by and give her and

their child some money.  (*Id.* at v. 13, pp. 1841–42.)  Another prosecution witness, Jerry Romero,

was an acquaintance of Marquez and testified that when he asked Marquez whether he had killed

Bonicelli, Marquez laughed and said he had.  (*Id.* at v. 14, p. 2055.)  When the prosecution asked

Romero whether he remembered telling a detective that Petitioner hired Marquez through Valdez

to kill Bonicelli, Romero testified he did not recall making those statements, but that he had

spoken with a detective and did not think the detective would lie about what he had told him at

the time.  (*Id.* at v. 14, pp. 2060–63.)  Later in the trial, the detective testified that Romero said

Marquez stated: (1) Petitioner hired Marquez to murder Bonicelli; (2) Petitioner owed Marquez

money for the job; and (3) when Marquez went to Petitioner for the money, Petitioner refused to

pay "[b]ecause detectives had too much heat on and the guys that owed the money weren't

paying it."  (*Id.* at v. 14, pp. 215–59.)

       After release from prison, Butierres engaged in a taped conversation with Petitioner.  (*Id.*

at v. 15, pp. 2278–79; Exhibit 147; Bench Exhibit V.)  Petitioner said his only role, if any, in the

Bonicelli and Phillips murders was "put[ting] people together."  (*Id.*, Exhibit 147; Bench Exhibit

V at 54.)  Specifically, Petitioner stated:

> I didn't, I didn't have nothin' to do with all that stuff.  I just put people together.
> And [Bonicelli] knows 'em from the shop, too, you know?  That's all I tried to do.
> See, a lot of times I didn't even want to know.  I put people together and let them
> take care of their own fucking business.  I didn't want to get involved.  A lot of
> that stuff I didn't want to get involved in.  [']Cause [Bonicelli] met 'em in the
> shop.  A lot of people met in the shop.

(*Id.*, Exhibit 147; Bench Exhibit V at 54.)

## 2.   *Procedural History*

       Petitioner was convicted by jury in the District Court of El Paso County, State of

Colorado, on two counts of First Degree Murder for the death of Ann Phillips and Eloise

Bonicelli.  (*Id.*, at v. 18, p. 11.)  The trial court imposed consecutive life sentences of

imprisonment for those two counts.  (*Id.* at v. 20, pp. 18–20.)  Petitioner directly appealed his

judgment of conviction to the CCOA, arguing the trial court erred in: (1) admitting certain

hearsay statements under the co-conspirator exception; (2) denying his motion to sever the two

murder counts; (3) denying his motion for a mistrial after the admittance of prejudicial polygraph

evidence; (4) failing to properly instruct the jury concerning the burden of proof; and (5) allowing

Phillips to testify under the guise of total immunity without proper establishment under the

statutory guidelines.  (Pet'r's App., Ex. 1, Part 2 at 9 [Pet'r's CCOA Br.].)  The CCOA reversed

Petitioner's conviction for the Bonicelli murder, because it had been based, in part, on

inadmissible hearsay evidence.  (*Id.*, Ex. 1, Part 1 at 67–69 [CCOA Decision].)  The court

affirmed Petitioner's conviction for the Phillips murder, concluding that admission of improper

hearsay evidence was harmless as to that count.  (*Id.*, Ex. 1, Part 1 at 69–70 [CCOA Decision].)

Petitioner initiated postconviction proceedings in the Colorado Supreme Court, arguing

the same claims as before the CCOA, but omitting the immunity claim.  (*Id.*, Ex. 1, Part 1 at

5–18, 38–49 [Pet'r's Colo. Sup. Ct. and U.S. Sup. Ct. Pets. for Cert.].)  The Colorado Supreme

Court denied certiorari on February 9, 2004, and the United States Supreme Court denied

certiorari on October 4, 2004.  (*Id.*, Ex. 1, Part 1 at 1–3, 20–21 [Colo. Sup. Ct. and U.S. Sup. Ct.

Cert. Denials].)  On October 3, 2005, Petitioner filed an application for a writ of habeas corpus

with this court, arguing the same claims as before the Colorado Supreme Court.  (Pet'r's App.)

On November 23, 2005, Respondents filed an answer.  (Answer to Application for Writ of

Habeas Corpus [filed Nov. 23, 2005] [hereinafter "Answer"].)  On December 19, 2005, Petitioner

filed a reply in support of his Application.  (Pet'r's Reply [filed Dec. 19, 2005] [hereinafter

"Pet'r's Reply"].)

## ANALYSIS

### 1.       Preliminary Matter: Exhaustion

"A threshold question that must be addressed in every habeas case is that of exhaustion."

*Harris v. Champion*, 15 F.3d 1538, 1554 (10th Cir. 1994).  Federal habeas corpus relief is not

available to a state prisoner unless all state court remedies have been exhausted prior to the filing

of the petition.  28 U.S.C. § 2254(b) (2006); *Harris*, 15 F.3d at 1554.  "In other words, the state

prisoner must give the state courts an opportunity to act on his claims before he presents those

claims to a federal court in a habeas petition."  *O'Sullivan v. Boerckel*, 526 U.S. 838, 843 (1999).

In this case, Respondents contend Petitioner failed to exhaust his claims that his Fifth and

Fourteenth Amendment rights under the United States Constitution were violated by that the trial

court's failure to grant his motion for: (1) mistrial after admission of the improper polygraph

evidence; and (2) severance of the two murder counts.  (Answer at 10–13.)  Specifically,

Respondents argue Petitioner "did nothing to alert the state appellate courts that he wished them

to address serious claims that [these] trial occurrences violated his constitutional rights."  (*Id.* at

12–13.)  Petitioner counters that his constitutional claims were sufficiently set forth upon direct

appeal.  (Pet'r's Reply at 1–2.)

As Respondents point out, to exhaust a claim for habeas corpus review, "'the proponent

must have presented the federal claim to the state courts unveiled.'"  (Answer at 11–12 [quoting

*Nadworny v. Fair*, 872 F.2d 1093, 1101 (1st Cir. 1989)].)  A petitioner must make his assertion

of a federal claim plainly apparent by, for instance, utilizing "specific constitutional language,

constitutional citation, appropriate federal precedent, substantive constitutional analogy, argument

with no masking state-law character, and the like—such as would in all likelihood alert a reasonable jurist to the existence of a federal question." *Id.* Moreover, "it is . . . well settled . . . that casual mention of an issue in a brief is cursory treatment insufficient to preserve this issue on appeal." *Kopst v. Kozakiwicz*, 1 F.3d 176, 182 (3d Cir. 1992).

In the instant case, Petitioner clearly stated in his first appellate submission and every submission thereafter that his claims regarding the polygraph evidence and severance were, in part, constitutional in character. In Petitioner's brief to the CCOA, he presented the two issues as follows:

> I. Whether the district court erred and abused its discretion, *while violating [Petitioner's] constitutional right to a fair trial pursuant to U.S. Const. Amend. V and XIV* and Colo. Const. Art. II. Sec. 25 by its refusal to sever the two murder counts?
>
> II. Whether the trial court *violated [Petitioner's] constitutional right pursuant to U.S. Const. Amend V and XIV*; Colo. Const. Art. II. Sec. 25 to a fair trial by denying the Defendant's request for a mistrial after the prosecution elicited prejudicial statements concerning polygraph testing . . . ?

(Pet'r's App., Ex. 1, Part 2 at 15 [Pet'r's CCOA Br.] [emphases added].)

Regarding severance, Petitioner stated in his brief to the CCOA that a defendant is "entitled to a separate trial as a matter of right whenever it appears . . . that the prosecution will introduce evidence, other than reputation or character testimony, which would not be admissible against him in a separate trial." (*Id.*, Ex. 1, Part 2 at 28 [Pet'r's CCOA Br.].) Petitioner supported this assertion with citation to a severance case considering the law under both the state of Colorado and the United States Constitution. (*Id.* [citing *People v. Johnson*, 560 P.2d 465, 487–88 (Colo. 1973)].) Further, Petitioner concluded his severance argument by stating, "to

allow the charges to be tried together clearly violated [Petitioner's] fundamental right to a fair trial in violation of his constitutional rights under the Fifth and Fourteenth Amendment of the United States Constitution." (*Id.*, Ex. 1, Part 2 at 29–30 [Pet'r's CCOA Br.].)  Finally, Respondents tacitly acknowledged the constitutional basis for Petitioner's severance claim in their answer to Petitioner's appellate brief, when they stated, "[Petitioner's] claims that his right to a fair trial was violated by the trial court's motion to sever." (*Id.*, Ex. 1, Part 3 at 23 [Pet'r's CCOA Br.].)

Regarding the polygraph evidence, Petitioner plainly stated in his appellate brief that "to allow the inclusion of Phillips' statement that he had offered to take a polygraph test as a means to ensure his being granted total immunity for killing his wife, the jury's role of determining credibility was clearly infringed upon and prejudiced [Petitioner] from receiving a fair trial on the matter." (*Id.*, Ex. 1, Part 2 at 33 [Pet'r's CCOA Br.].)  Further, Petitioner stated this admission "deprived" him "of his constitutional right to both due process and a fair trial as guaranteed him under the Fifth and Fourteenth Amendment to the United States Constitution." (*Id.*)

As a final note, Petitioner points out that the Colorado Supreme Court, which received a petition for certiorari substantially similar to Petitioner's submission to the CCOA, was clearly alerted to Petitioner's constitutional claims.  (Pet'r's Reply at 2.)  Two justices would have granted certiorari on "[w]hether the trial court violated [Petitioner's] right to both due process and a fair trial as guaranteed him under the Fifth and Fourteenth amendments to the United States Constitution . . . by refusing to grant the requested mistrial," and one justice would have granted certiorari on "whether the trial court . . . violated [Petitioner's] due process rights as guaranteed

-9-

him by the United States Constitution Amend. V and XIV . . . by refusing to sever the two

murder counts." (*Id.*, Ex. 1, Part 1 at 20–21 [Colo. Sup. Ct. Cert. Denial].)  Based on the

foregoing, I find it utterly clear that Petitioner's state court submissions would have, and in fact

did, "in all likelihood alert[ed] a reasonable jurist to the existence of a federal question."

*Nadworny*, 872 F.2d at 1101.  Thus, I find Petitioner has properly exhausted the claims at issue.

**2.      *Standard of Review***

        Because Petitioner filed his habeas corpus petition after Antiterrorism and Effective Death

Penalty Act's (AEDPA) effective date, its provisions apply to this appeal.  *Smallwood v. Gibson*,

191 F.3d 1257, 1264 (10th Cir. 1999).  A state prisoner is entitled to habeas relief only if he is

held "in custody in violation of the Constitution or laws or treaties of the United States."  28

U.S.C. § 2254(a) (2006).  To the extent a petitioner challenges an alleged error under state law,

he alleges no deprivation of federal rights and may not obtain habeas relief.  *Engle v. Isaac*, 456

U.S. 107, 119 (1982).  Where a constitutional claim was adjudicated on the merits in the state

courts, habeas relief may only be granted when the state court proceeding resulted in a decision

that was: (1) "contrary to, or involved an unreasonable application of clearly established Federal

law, as determined by the Supreme Court;" or (2) "based on an unreasonable determination of the

facts in light of the evidence presented in the State court proceeding."  28 U.S.C. §

2254(d)(1)–(d)(2) (2006).  The AEDPA "amended the standards for reviewing state court

judgments" in habeas proceedings, ultimately "increas[ing] the deference to be paid by the federal

courts to the state court's factual findings and legal determinations."  *Houchin v. Zavaras*, 107

F.3d 1465, 1470 (10th Cir. 1997).

In *Williams v. Taylor* the Supreme Court provided guidance as to when a state court decision may be deemed "contrary to" or "an unreasonable application of" established Supreme Court precedent pursuant to section 2254(d)(1).  539 U.S. 362 (2000).  As to the former term, a state court decision is "contrary to" Supreme Court precedent when it: (1) "arrives at a conclusion opposite to that reached by [the] Court in a question of law;" or (2) "confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Id.* at 405–06.  As to the latter term, a state court decision involves an "unreasonable application" of Supreme Court precedent if "the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 409–13.  Thus, "under § 2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, the application must also be unreasonable." *Id.* at 411; *see also Thomas v. Gibson*, 218 F.3d 1213, 1219–20 (10th Cir. 2000) (discussing *Williams*).  In federal habeas proceedings, the petitioner bears the burden of proof. *Miller-El v. Cockrell*, 537 U.S. 332, 358 n.3 (2003).

### a.    *Polygraph Evidence*

The trial record reflects that during direct examination, when Phillips was asked to explain the immunity offer extended to him by the prosecution, he replied, "They offered me immunity from my case and the Bonicelli case if I was willing to talk with them and give them everything I knew, including the polygraph test, and I said fine."  (State R. at v. 12, p. 1515.)  Defense counsel

immediately moved for a mistrial, stating, "This guy just mentioned polygraph. Can't throw a skunk in the jury box and expect it not to smell." (*Id.*) The trial court denied the motion, concluding that it was "not persuaded that what [the witness] ha[d] said so far ha[d] tainted the panel irreparably." (*Id.*) Defense counsel ultimately accepted the trial court's offer of a curative instruction but renewed the objection. (*Id.* at v. 12, p. 1516.) The jury was thereafter instructed as follows: "Members of the jury, an objection was made with regard to some of the testimony you just heard, and I'm sustaining the objections. You are not to consider any reference that has been made in this Court to polygraph or a polygraph test. You are not to consider it in any way." (*Id.* at v. 12, p. 1517.)

Petitioner argues that by denying his motion for mistrial, the trial court abused its discretion and violated his Fifth and Fourteenth Amendment rights under the United States Constitution. (Pet'r's App. at 9–11.)[1] Specifically, Petitioner contends Phillips' statement "clearly suggest[ed] to the jury that had he not passed this examination he would not be testifying before the jury" and that, as a result, "the jury's role of determining credibility was infringed upon and prejudiced [Petitioner] from receiving a fair trial." (*Id.*) Respondent counters that the witness' "reference to a polygraph test was brief, inadvertent, and made no mention of actually taking such a test or any test results," and, thus, did not violate Petitioner's constitutional rights. (Answer at 16–17.)

---

[1]Every page of Petitioner's Application is numbered "21." (*See* Pet'r's App.) For the purpose of clarity, this court has taken the liberty of numbering the pages correctly.

Generally, the use of and admissibility of polygraph evidence is a matter of state law. *Weston v. Dormire*, 272 F.3d 1109, 1113 (8th Cir. 2001). "For the purposes of habeas review," this court, therefore, "consider[s] only the question of whether the state trial court's ruling . . . rendered [Petitioner's] trial fundamentally unfair." *Id.* Petitioner has pointed to no Supreme Court precedent, and this court's research has revealed none, showing that the trial court's denial of Petitioner's motion for mistrial under these circumstances was "contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court."[2] 28 U.S.C. § 2254(d)(1) (2006). In fact, the Supreme Court denied certiorari on a case in which the Fourth Circuit found the trial court's refusal to give the defendant's requested curative instruction that the jury disregard the mention of a polygraph test in the prosecution's star witness' immunity agreement did not violate the defendant's right to a fair trial. *Arnold v. Evatt*, 113 F.3d 1352, 1363–64 (4th Cir. 1997), *cert. denied*, 522 U.S. 1058 (1998). The circuit court concluded that "[t]here is simply no reason to believe . . . that an inference about a polygraph test, concerning a witness who testified at length on direct and cross examination, significantly affected the jury's credibility assessment." *Id.* at 1364. Here, Phillips also testified at length on direct and cross examination. (State R. at v. 12, pp. 1438–1591.) Moreover, the witness' reference to a polygraph test was brief, inadvertent, and made no mention of actually taking such a test or any test results, rendering the statement the kind of error that generally can

---

[2]Instead, to prove the constitutional violation, Petitioner relies exclusively on Colorado state court decisions that do no more than cursorily address federal constitutional issues. (*See* Pet'r's App. at 9–11.)

be remedied by a curative instruction. *See, e.g.*, *Greer v. Miller*, 435 U.S. 756, 766 (1987)

(where a prosecutor asked a single improper question, and there was an immediate objection

followed by curative instructions, the prosecutor's improper question did not violate the

defendant's due process rights); *United States v. Tedder*, 801 F.2d 1437, 1445 (4th Cir. 1986)

("[E]ven if some jurors drew an inference about the results of the [polygraph] test, there is no

special reason in this case to believe that the inference was any more critical in assessing the

witness' credibility than it was in cases in which a curative instruction was found to be

sufficient.").[3]  Based on the foregoing, I find the trial court's denial of Petitioner's motion for

mistrial was not an unreasonable application of or contrary to clearly established Supreme Court

precedent.[4]  *See* 28 U.S.C. 2254(d)(1) (2006).

> **b.** **Harmless Error**

At Petitioner's trial, Marquez's ex-girlfriend testified that soon after Bonicelli's murder,

Marquez called her and told her he had just finished doing a job for $10,000 and, before leaving

town, wanted to stop by and give her and their child some money.  (State R. at v. 13, pp.

---

[3]It is possible that some federal courts, on direct review, would have found reversable error here.  *Cf. United States v. Miller*, 874 F.2d 1255, 1263 (9th Cir. 1989) (finding that admission of polygraph evidence constituted reversable error since the witness' "admissions were at the heart of the prosecution's case").  I emphasize, however, that this court's role in a habeas proceeding is *not* to determine whether the state court "applied clearly established federal law erroneously or incorrectly."  *Thomas*, 218 F.3d at 219–20.  Rather, the application must also have been an unreasonable application of or contrary to Supreme Court precedent.  *See* 28 U.S.C. § 2254(d)(1) (2006).

[4]Petitioner's does not even arguably assert that any of his claims are based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding; thus, I do not consider the issue.  *See* 28 U.S.C. § 2254(d)(2) (2006).

1841–42.)  Another prosecution witness, Jerry Romero, was an acquaintance of Marquez and testified that when he asked Marquez whether he had killed Bonicelli, Marquez laughed and said he had.  (*Id.* at v. 14, p. 2055.)  When the prosecution asked whether Romero remembered telling a detective that Petitioner hired Marquez through Valdez to kill Bonicelli, Romero testified he did not recall making those statements, but that he had spoken with a detective and did not think the detective would lie about what he had told him at the time.  (*Id.* at v. 14, pp. 2060–63.)

On appeal, the CCOA found the trial court erred when it allowed Marquez's ex-girlfriend and Romero to testify regarding statements made by Petitioner based on the co-conspirator's exception to the hearsay rule, because the statements were not made in furtherance of a conspiracy.  (Pet'r's App., Ex. 1, Part 1 at 62–70 [CCOA Decision].)  The court concluded the error was harmless beyond a reasonable doubt with regard to the Phillips murder but not with regard to the Bonicelli murder.  (*Id.*)

Petitioner contends the error was not harmless beyond a reasonable doubt even with regard to the Phillips murder.  (Pet'r's App. at 11–13.)  According to Petitioner, the prosecution hinged its case on showing the two homicides were committed as part of an ongoing conspiracy and were allegedly carried out for the same amount.  (*Id.* at 12.)  The hearsay evidence, argues Petitioner, was the only testimony linking the two murders, which clearly renders the testimony harmful.  (*Id.*)  Respondents, in turn, reiterate the trial court's conclusion that any impact of the hearsay evidence on the Phillips murder was counteracted by the strong evidence of Petitioner's guilt for that murder.  (Answer at 18–20.)

In *Chapman v. California* the Supreme Court held that to avoid being overturned on appeal, "the beneficiary of a constitutional error [must] prove beyond a reasonable doubt that the error [was harmless]."   386 U.S. 18, 25 (1967).   I find the CCOA's application of this standard was neither an unreasonable application of nor contrary to Supreme Court precedent.   *See* 28 U.S.C. § 2254(d)(1) (2006).   Assuming the damaging potential of the hearsay statements was realized, the CCOA determined admission of the improper evidence was harmless beyond a reasonable doubt as to Petitioner's conviction for the Phillips' murder, because "[t]he evidence of defendant's guilt as to the first killing was strong." (Pet'r's App., Ex. 1, Part 1 at 66–69 [CCOA Decision].)  The court pointed out that not only did Phillips testify at length as to the details of his arrangement with Petitioner for the contract killing, but Petitioner's fingerprints were also found on the passenger side of the car in which the victim had been a passenger at the time of the murder.  (*Id.*, Ex. 1, Part 1 at 69 [CCOA Decision].)  In addition, the court found that the prosecution did not attempt to argue the hearsay evidence proved Petitioner's guilt for the Phillips murder.  (*Id.*)  Petitioner does not directly contest any of these findings, but, instead, inexplicably states, "It is impossible for [the hearsay] evidence to be harmless beyond a reasonable doubt because this testimony was the only evidence that even remotely linked [Petitioner] to the offenses." (Pet'r's Reply at 9–10.)  This court's review of the record, however, reveals all of the trial court's findings regarding the independent evidence of Petitioner's guilt are well supported. (*See* State R. at v. 12, pp. 1472–76, 1496–97, 1517–18, 1542 [ Phillips' testimony concerning contracting with Petitioner]; v. 12, pp. 16–17, 1635, 1644 [Petitioner's fingerprints on the Phillips' car]; v. 16, pp. 51–53, 77–79, 82, 88 [discussion of the hearsay evidence in the

-16-

prosecution's closing argument and rebuttal].)  Considering the ample independent evidence of

Petitioner's guilt for the Phillips murder, as well as the prosecution's complete lack of reliance on

the hearsay statements to prove guilt for that murder , the trial court's finding that there was no

reasonable possibility that the error contributed to the verdict was not an unreasonable application

of or contrary to Supreme Court precedent.  *See Brecht v. Abrahmson*, 507 U.S. 619, 637 (1993)

(defining harmless-beyond-a-reasonable-doubt standard as no "'reasonable possibility' that trial

error contributed to the verdict"); *Parker v. Randolph*, 442 U.S. 62, 70–71 (1979) ("In some

cases, the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the

codefendant's admission so insignificant by comparison, that it is clear beyond a reasonable doubt

that introduction of the admission at trial was harmless error."), *overruled in part on other

grounds by Cruz v. New York*, 481 U.S. 168, 191 (1987); *accord Schneble v. Florida*, 405 U.S.

427, 431–32 (1972); *Harrington v. California*, 395 U.S. 250, 253–54 (1969).

### c.    *Severance of the Two Murder Counts*

The record reflects that on December 27, 2000, Petitioner filed a motion to sever the two

murder counts, because: (1) the two incidents "took place well over a year apart and involved two

entirely different victims and circumstances;" and (2) failure to sever would "raise a presumption

of guilt on the ground that, having committed one crime, the depravity it exhibits makes it likely

he would commit another."  (State R. at v. 1, pp. 145–47.)  On May 7, 2001, the trial court issued

a written order denying the motion to sever, because the court found the evidence in both cases to

be "substantially interrelated," and "the probative value of the interrelated proof outweigh[ed] the

prejudicial effect of both counts being tried in a single trial."  (*Id.* at v. 2, pp. 200–01.)  Petitioner

failed to renew his motion to sever at trial.  On direct appeal, Petitioner argued that the trial court

abused its discretion in denying his motion and that, had Petitioner been aware the prosecution

intended to offer inadmissible hearsay under the co-conspirator exception, Petitioner would have

argued the prejudice incurred by the admission in its initial motion to sever.  (*Id.*)  The CCOA

found that because Petitioner failed to renew its motion for severance "during trial in order to

alert the trial court to the necessity of reconsidering its original decision in light of the evidence

presented at trial, it was deemed waived."  (*Id.*, Ex. 1, Part 1 at 70–71 [CCOA Decision].)

Petitioner contends that by refusing to sever the two murder counts, the trial court abused its

discretion and violated his right to due process under the United States Constitution.  (Pet'r's

App. at 13–14.)  Respondents counter that the CCOA properly found Petitioner had procedurally

defaulted his severance claim by failing to renew his motion to sever.  (Answer at 20–22.)

 Under AEDPA, a federal court "generally may not consider 'issues on habeas review that

have been defaulted in state court on an independent and adequate state procedural ground, unless

the petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice.'"

*Hammon v. Ward*, 466 F.3d 919, 925 (10th Cir. 2006) (quoting *Smallwood v. Gibson*, 191 F.3d

1257, 1268 [10th Cir. 1999]).  Petitioner does not dispute that under Colorado law, failure to

renew a motion for severance of counts waives appellate review of the issue.  (Pet'r's Reply at 10

[citing *People v. Aalbu*, 696 P.2d 796, 806 (Colo. 1985)].)  "The purpose of the renewal motion,"

according to the Colorado Supreme Court, "is to alert the court to the necessity of reconsidering

its original decision in light of the evidence presented at trial and to permit the defendant to

reevaluate the issue of prejudice and to elect to proceed with a consolidated trial despite the risk

of prejudice." *Id.* (internal quotations omitted).

Petitioner does not deny that the Colorado procedural rule is an independent and adequate

state procedural ground. (*See* Pet'r's App. at 13–15; Pet'r's Reply at 10–11.)  Instead, Petitioner

contends he has cause for failure to comply with the rule and has experienced prejudice as a result

of its application. (*See* Pet'r's App. at 13–14; Pet'r's Reply at 10–11.)  I need only address

Petitioner's claim of cause.  Petitioner contends that after the wrongful admission of the hearsay

statements, renewal of his motion to sever "would have been moot[,] because the admittance of

the hearsay statements virtually created a nexus between the once separated cases." (Pet'r's App.

at 21.)  Petitioner's argument is wholly unavailing.  The Supreme Court has made clear that "the

futility of presenting an objection to the state courts cannot alone constitute cause for a failure to

object at trial," and a petitioner "may not bypass the state courts simply because he thinks they

will be unsympathetic to the claim." *Engle v. Isaac*, 456 U.S. 107, 130 (1982).  Although

Petitioner believes the "[CCOA] failed to internalize the evolving posture of the trial as evidence

was admitted, with specific emphasis on the admittance of the co-conspirator hearsay statements,"

(Pet'r's App. at 14), what *Petitioner* fails to internalize is that it was *his* duty to alert the trial

court as to the "evolving posture" of the trial and any concomitant necessity of reconsidering the

court's original ruling on the motion to sever. *See Aalbu*, 696 P.2d at 806.  Based on the

foregoing, I find Petitioner has defaulted in state court on an independent and adequate state

procedural ground, and Petitioner has failed to show cause for this non-compliance.  Thus, under

AEDPA, this court may not consider Petitioner's constitutional claims concerning denial of his motion to sever.  *See Hammon*, 466 F.3d at 925.

> ### d.     Jury Instructions

Petitioner's fourth and final claim is that as a matter of plain error, and in violation of his constitutional right to due process, the jury was incorrectly instructed concerning the prosecution's burden of proof.  (Pet'r's App. at 15–17.)  The record reflects that both jury instructions concerning the elements of first degree murder contained the following language: "After considering all the evidence, if you decide the prosecution has failed to prove each of the elements beyond a reasonable doubt, you should find the defendant not guilty of Murder in the First Degree."  (State R. at v. 2, pp. 342–33.)  Petitioner did not object to the instruction at trial. (*Id.*, v. 16,  pp.36–41.)  Petitioner contends that the wording of this jury instruction suggests that Petitioner should have been found not guilty only if the prosecution failed to prove *all* elements of the offense; when, in fact, the law mandates a defendant be found not guilty if the prosecution fails to prove *any* element of the offense.  (Pet'r's App. at 15–17.)  The proper instruction, argues Petitioner, is that contained in the jury instruction on reasonable doubt: "If you find from the evidence that the prosecution has failed to prove any one or more of the elements beyond a reasonable doubt you will find the defendant not guilty." (*Id.* at 16; *see* State R. at v. 2, p. 331.) Respondents counter that Petitioner's argument has been repeatedly rejected by the CCOA and that Petitioner has not met its heavy burden in a habeas proceeding.  (Answer at 23–25.)

As Petitioner concedes, an applicant for habeas corpus attempting to set aside a state conviction because of prejudice from an erroneous jury instruction has a heavy burden.  (Pet'r's

Reply at 12 [citing *Nguyen v. Reynolds*, 131 F.3d 1340, 1357 (10th Cir. 1997)].)  The Supreme

Court has stressed that "the question in such a collateral proceeding is 'whether the ailing

instruction by itself so infected the entire trial that the resulting conviction violates due process,'

not merely whether 'the instruction is undesirable, erroneous or even universally condemned.'"

*Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147

[1973] [internal citations omitted]).  Moreover, "[i]t is the rare case in which an improper

instruction will justify reversal of a criminal conviction when no objection has been made in the

trial court."  *Id.*

   In the instant case, in addition to the instruction Petitioner complains of, the jury was

given the following instruction regarding reasonable doubt:

> The burden of proof is upon the prosecution to prove to the satisfaction of the jury
> beyond a reasonable doubt the existence of all of the elements necessary to
> constitute the crime charged. . . .

> If you find from the evidence that each and every element has been proven beyond
> a reasonable doubt, you will find the defendant guilty.  If you find from the
> evidence that the prosecution has failed to prove any one or more of the elements
> beyond a reasonable doubt you will find the defendant not guilty.

(State R., v. 2, p. 331.)  These instructions make clear that the prosecution had the burden to

prove every element of the crime charged.  Considering the jury instructions as a whole, and

"[w]ithout ultimately passing on the desirability of the challenged . . . instruction, [this court]

concludes its use in this case did not so infect Petitioner's trial as to deprive him of a fair trial or

due process of law."  *See Nguyen*, 131 F.3d at 1357; *Patton v. Mullin*, 425 F.3d 788, 804 (10th

Cir. 2005) (quoting *Francis v. Franklin*, 471 U.S. 307, 315 [1985]) (noting that when analyzing

an improper jury instruction, the court should consider the jury instructions "as a whole" and that "'[o]ther instructions [may] explain the particular infirm language to the extent that a reasonable juror could not have considered the charge to have created an unconstitutional presumption'"). Additionally, Petitioner has failed to show prejudice as a result of the purportedly erroneous instruction.  He neglected to explain what element the jury could have reasonably found the prosecution failed to prove beyond a reasonable doubt had the jury been "properly" instructed. (*See* Pet'r's App. at 17.)  Further, Petitioner does not point to a single case in which the jury instruction at issue, or one similar to it, was found to constitute constitutional error.[5]  (*See* Pet'r's App. at 15–17.)  Based on the foregoing, I find Petitioner has fallen far short of meeting his "heavy burden" in attempting to set aside his conviction based on an erroneous jury instruction. *Nguyen*, 131 F.3d at 1357.

**3.      Conclusion**

        In accord with the foregoing, it is therefore ORDERED that Petitioner's petition for a writ of habeas corpus (# 1) is DENIED.

        Dated this 18th day of January, 2007.

                                        BY THE COURT:

                                        s/ Edward W. Nottingham
                                        EDWARD W. NOTTINGHAM
                                        United States District Judge

---

[5]Instead, Petitioner points to the fact that the jury instruction was changed in 1993 to reflect the wording for which Petitioner now argues.  (*Id.*)  Petitioner's observation conceivable supports a finding that the instruction is undesirable, which in no way affects this court's analysis. *See Henderson*, 431 U.S. at 154.